## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| IN RE: | CHARMAINE A. RICHIE, | Case No. 06-20188 |
| | Debtor. | Chapter 7 |

## ORDER GRANTING TRUSTEE'S MOTION TO DISMISS

Debtor Charmaine Richie filed her Chapter 7 petition on January 20, 2006. The United States Trustee has moved to dismiss the debtor's bankruptcy proceeding as an abuse of the provisions of Chapter 7. The trustee made this motion pursuant to §§ 707(b)(1) and (b)(3)(B) of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). For the following reasons, the Court grants the trustee's motion to dismiss this case.

I. **Facts**

The following facts are taken from information in the debtor's schedules and other filed documents, arguments advanced by counsel for the U.S. Trustee, and testimony that the debtor provided at the hearing on the motion to dismiss.

    A.    <u>Information in the schedules and other documents</u>

The debtor filed her Chapter 7 petition on January 20, 2006; BAPCPA is the applicable governing law. Along with her petition, the debtor filed–as she is required to do–a Form B22A, Statement of Current Monthly Income and Means Test Calculation. The calculations on this form indicated that the debtor's "current monthly income"–her average monthly income for the six calendar months prior to the month in which she filed her bankruptcy petition–was $1,884 a month. Annualized, the debtor's "current monthly income" came to $22,608 per year, well under

1

the $37,873 applicable median income for a family of comparable size in Wisconsin. Accordingly, the § 707(b)(2)(A) presumption of abuse did not arise for this debtor.[1]

The schedules the debtor filed on January 20 indicated that at the time of filing, the debtor had a monthly income of $2,275.00 which, when annualized, amounted to $27,300 per year. She listed monthly expenses of $1,485.00, including $500 per month for food, $200 per month for clothing, $20 per month for laundry and dry cleaning, $40 per month for medical and dental expenses, $150 per month for transportation expenses, and $200 per month for recreation, clubs and entertainment, newspapers, magazines and the like. Subtracting her Schedule J expenses from her Schedule I income, the debtor had some $790 per month left over. She listed $109,710.35 in unsecured, nonpriority debt, a good portion of which constituted medical debt. She also listed a $500 unsecured priority tax claim. The debtor listed no secured debt.

On April 17, 2006, the United States Trustee filed its motion to dismiss. As the basis for its motion, the trustee relied on a new provision of the bankruptcy law, enacted through BAPCPA–§ 707(b)(3). The Court scheduled a hearing for May 25, 2006.

B.   Counsel's arguments

At the hearing, counsel for the trustee indicated that the Court should dismiss the debtor's case pursuant to 11 U.S.C. 707(b)(3)(B), which requires a court to consider whether "the totality of the circumstances (including whether the debtor seeks to reject a personal services contract

---

[1] Section 707(b)(2)(A)(i) of BAPCPA requires a court to presume that abuse exists if the debtor's average income for the six months preceding the month in which she filed her bankruptcy petition, minus certain expenses and multiplied by 60, is not less than the lesser of $10,000 or a certain percentage of her nonpriority unsecured claims. Practically speaking, the presumption does not arise for debtors whose annualized current monthly incomes are under the applicable median family income for their state.

2

and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse." Transcript at pp. 6-7, *quoting* § 707(b)(3)(B).

In support of her contention, the trustee observed that BAPCPA had brought about certain changes in § 707(b). In particular, she noted that "the presumption in favor of granting relief of the Debtor no longer exists, and the Court looks for an abuse as opposed to a substantial abuse." Transcript at pp. 25-26.

Specific to this case, counsel for the trustee argued that the debtor recently had completed an advanced degree and was seeking work in her field. The trustee stated, "She's going to have a job. She's done with her schooling. Just at that point is when she's filing the bankruptcy. It doesn't seem that she's made an honest effort, an honest attempt to try and pay her debts." Transcript at p. 9. In addition, the trustee stated, "She's in the best position she's ever been in to find work, and to allow her to continue in Chapter 7 would be an abuse of the bankruptcy system." Transcript at p. 26. In short, counsel for the trustee argued, the relevant question was, ". . . is the Debtor voluntarily unemployed?" Transcript at p. 11.

The debtor's counsel argued that no abuse existed. Transcript at p. 26. He informed the Court that at that moment, the debtor was unemployed. Her previous employment (which had lasted only two or three months) had been terminated a month or so before the hearing (after the date the debtor filed her petition), and she was receiving unemployment compensation at the time of the hearing. Transcript at p. 4. He argued that the debtor had medical bills, as well as substantial, non-dischargeable student loan debt. Transcript at p. 26. Counsel also told the Court that he and the debtor had considered whether to file a Chapter 13 petition rather than a Chapter 7, but had concluded that "it just didn't appear to be feasible given the debts that she

3

owed and particularly the educational loans that were going to be coming due . . . ." Transcript at p. 5.

C.    <u>Debtor's testimony</u>

The debtor testified that she recently had received a master's degree in the field of "outdoor therapeutic recreation administration." Transcript at p. 12. This degree qualified her to perform "therapeutic work with at-risk youth or developmentally or physically disabled individuals, . . . usually in a camp setting or a clinical setting." Transcript at p. 13.

The debtor told the Court that, due to her status as a full-time student, she had not been employed full-time since September of 2003, other than the three months she worked in a sales job. Transcript at p. 19. She also testified that she had been fired from the sales job in April because she had not met the sales quota. Transcript at p. 21. The debtor further indicated that she had not been able to repay debts while she worked in sales; all of the money she made went to pay her bills, and she lived paycheck to paycheck. She also stated that during the time she worked in the sales position, she'd had continuing medical issues which caused medical bills to accrue. Transcript at p. 23.

The debtor testified that she'd applied for more than five jobs in her field in the past month. Transcript at p. 16. She told the Court that she had looked for jobs in her field since her graduation, applying for positions at camps in Golden, Colorado and Sante Fe, New Mexico (which apparently she did not get). Transcript at p. 14. When asked if she was willing to relocate to get a job in her field, the debtor answered:

4

I don't really want to. I don't know if I would be able to. I don't know
why I really applied [in Colorado and New Mexico], just to see if I would be able
to get the job. I don't see that it would be feasible for me to move right now, but
finding a job in the Racine, Kenosha area has been a challenge.

Id.

Asked whether she'd applied for any jobs in Wisconsin or Illinois, the debtor replied that

she had not applied for any jobs "in this field" since April, and outside her field had applied for

"temporary jobs, student teaching, what I used to do." She indicated that she had not yet gotten

any student teaching jobs. Transcript at p. 15.

The debtor told the Court that she had not applied for any full-time jobs outside her field

because "[a]fter the amount of money that I spent in my field and the time and effort I put into

my studies I would like to go into that field." Transcript at p. 23. When reminded of the fact that

legitimate creditors existed who might be paid if she were employed in *any* field, the debtor

responded:

> The problem that I find with that is I have had a lot of jobs in the past, and
> I don't want to keep jumping from job to job, and I don't want to start a job and
> only put in two months worth only to have to quit that and start a job in my field.
> It's not fair to an employer to make them believe that I have long-term goals with
> them if my true intentions are to continue looking for a therapeutic position and
> quit as soon as I secure a position as a therapist.

Transcript at pp. 24-25.

The debtor testified that she lived with her employed boyfriend, who paid the mortgage

while she paid the gas, electric, phone and grocery bills. Transcript at p. 17. She testified that

she owned a 1995 Lexus. Transcript at p. 19. When asked about the $200 a month she

scheduled for recreation, the debtor answered that she hiked, biked and engaged in sports

activities. Transcript at p. 18. Later, she testified she might have used that money for "a state

5

park pass, buying ice skates. I don't know, a subscription to the Journal of Experiential Education, which is a subscription, I suppose." Transcript at p. 20.

II.  **Jurisdiction**

The issue in this case involves a core proceeding under 28 U.S.C. § 157(b)(2)(A), and this Court has jurisdiction under 28 U.S.C. § 1334(b).

III.  **Analysis**

A.  *Evolution of Section 707(b)(3)*

The trustee argues that under the totality of the circumstances, it is an abuse of the provisions of Chapter 7 for this debtor to receive a discharge when she is eligible, as a result of her advanced degree, to make a better income, and when she has made no real efforts to find work outside her field to avoid the need to file for bankruptcy. This argument requires the Court to look more closely at the term "abuse," as Congress used it in § 707(b).

Prior to October 17, 2005, § 707(b) dealt with consumer debtors who inappropriately sought immediate discharge under Chapter 7 by allowing a court to dismiss a Chapter 7 proceeding for such a debtor "if it [found] that the granting of [the discharge] would be a *substantial* abuse of the provisions" of Chapter 7 (emphasis added). In his article entitled <u>Means Testing in the New § 707(b)</u>, Chief Judge Eugene Wedoff pointed out that this pre-BAPCPA version of § 707(b) contained, for lack of a better term, loopholes. Judge Wedoff observed that

> . . . pre-BAPCPA § 707(b) had five . . . features that limited its effect: (1) it applied only to individual debtors "whose debts are primarily consumer debts," thus making it inapplicable to wealthy individuals with business or investment obligations in excess of their consumer debts; (2) it included a presumption "in favor of granting the relief requested by the debtor;" (3) *it gave no definition of "substantial abuse," leading to uncertain application under a range of judicial decisions*; (4) it could be pursued only on motion of the court (or, after a 1986

6

amendment, of the United States trustee), with other parties prohibited from
requesting or suggesting that such a motion be brought; and (5) pursuant to a 1998
amendment to the Code, it prevented consideration of a debtor's contributions to
tax-exempt charities in determining substantial abuse.

Eugene R. Wedoff, Means Testing in the New § 707(b), 79 American Bankruptcy L. J. 231, 233-
34 (2005) (emphasis added).

The BAPCPA amendments changed § 707. Under BAPCPA, § 707(b) now states that a
court may dismiss a consumer debtor's Chapter 7 proceeding if "it finds that the granting of [the
discharge] would be *an abuse* of the provisions" of Chapter 7." (Emphasis added) Gone is the
word "substantial"–now, a court may dismiss simply for abuse. The new version of § 707(b)
suffers from one of the same flaws suffered by its predecessor–it does not define the term
"abuse." It does, however, give courts some guidance as to what kind of information they can
consider in determining whether abuse exists.

To assist courts in making the abuse determination, Congress created sub-parts to §
707(b). Sub-part (b)(2) is the infamous "means test," a mathematical calculation which, if it
produces certain results, requires courts to presume that a debtor is too financially well-off to
obtain an immediate discharge without making some attempt to repay creditors. If, after the
debtor performs the mathematical calculations, the presumption of abuse arises, the debtor must
rebut that presumption in order for her Chapter 7 to survive dismissal.

Even if a debtor's finances do not give rise to the means test presumption, BAPCPA still
gives the court discretion to dismiss her case. New sub-section (b)(3) applies to those debtors
who escape the § 707(b)(2) presumption. It states:

7

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the [means test] presumption . . . does not arise or is rebutted, the court shall consider–
>
> (A)    whether the debtor filed the petition in bad faith; or
>
> (B)    the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3).

Thus, for a debtor who passes the means test, the court still may dismiss her Chapter 7 proceeding if either she filed the petition in bad faith or the totality of her financial circumstances demonstrates that it would constitute abuse to allow her to obtain an immediate discharge under Chapter 7. *See*, *e.g.*, In re: Hill, 328 B.R. 490, 507 (Bankr. S.D. Tex. 2005) (court can find abuse even when § 707(b)(2) presumption does not arise); In re: Pak, 343 B.R. 239, 241 (Bankr. N.D. Cal. 2006) (test for determining whether a below-median income debtor has abused the system is found in § 707(b)(3)); In re: Paret, 347 B.R. 12, 15 (Bankr. D. Del. 2006) ("No presumption of abuse does not mean no abuse.")

B.    *Application of the Totality of the Circumstances Test*

At the hearing, counsel for the trustee indicated that she sought dismissal of the debtor's case under the totality-of-the-circumstances prong of § 707(b)(3). The question for the Court, then, is whether the debtor's overall circumstances indicate that she is abusing the provisions of Chapter 7 by seeking an immediate discharge of her debts, rather than attempting to pay some dividend to her creditors through a Chapter 13 plan. This question begs another–what are the

8

"circumstances" that make up "the totality of the circumstances?" What should the Court look at to make this determination?

The Court concludes that it must look at the debtor's ability to pay her creditors at the time of the hearing on the motion to dismiss. Further, the Court finds that if the debtor does not have an ability to pay creditors at the time of the hearing, it must delve further and find out why the debtor does not have the ability to pay. Finally, the Court concludes that if the debtor's inability to pay creditors is self-imposed, it may consider this fact both in terms of the totality of the debtor's financial circumstances and the debtor's good–or bad–faith.

1. ***The Court must consider the debtor's ability to pay her creditors in looking at the totality of the circumstances.***

One of the circumstances the Court concludes it must consider is whether the evidence indicates that the debtor has the ability to pay her debts. At least two courts have held that considering whether a debtor has the ability to pay her debts is an appropriate part of determining whether there is abuse under § 707(b)(3)(B). *See, e.g.*, In re: Pak, 343 B.R. 239, 244 (Bankr. N.D. Cal. 2006) (". . . the Debtor's actual ability to repay his nonpriority unsecured debts may be considered as part of the totality of the circumstances of his financial situation pursuant to section 707(b)(3)"); In re: Paret, 347 B.R. 12, 15 (Bankr. D. Del. 2006) (". . . the Code mandates consideration of a debtor's ability to pay his creditors within the test articulated in paragraph (b)(3)"); In re: Pennington, ___ B.R. ___, 2006 WL 2505942 *2 (Bankr. D. Del., August 30, 2006). The Court agrees with the reasoning in these decisions.

9

2.    ***The debtor's ability to pay was different at the time she
      filed her petition and at the time of the hearing.***

In her written motion to dismiss, counsel for the trustee argued that the debtor's schedules showed that the debtor had the ability to pay a dividend to her creditors. Based on the income figures in the debtor's January 2006 Schedule I, the debtor's income was $3,466 per month gross and she netted $2,275 of that. Counsel for the trustee pointed out that, after obtaining the sales job in 2005, the debtor earned $9,788 in only three months.

Counsel for the trustee argued that if the debtor subtracted her Schedule J expenses of $1,485 from her Schedule I income of $2,275, she would have $790 left over each month to devote to paying her debts. Counsel for the trustee calculated that this would enable the debtor to pay $28,440 of her unsecured debt in a 36-month Chapter 13 plan (a 25.9% dividend to her creditors), and $47,400 in a 60-month plan (a 43.2% dividend to her creditors). This ability to pay, the trustee's counsel argued, demonstrated that it was an abuse of Chapter 7 for the debtor to obtain an immediate discharge of all of her unsecured debt. Further, the trustee's counsel argued in her written motion that the debtor was scheduled to finish her advanced degree in May of 2006, and thus her earning capacity would increase. At the time she filed her petition, trustee's counsel argued, the debtor had an immediate ability to pay some dividend to her creditors.

The evidence presented at the May 25, 2006 hearing demonstrated, however, that the debtor's financial circumstances had changed in the four months since the debtor had filed her Chapter 7 petition. The debtor had been fired from the job that had paid her a net of $2,275 per month. Indeed, she'd had that job only for about three months before losing it. At the time of the hearing, the debtor was unemployed, and her only source of income was unemployment

10

compensation. Thus, at the moment that she sat in the hearing, the debtor did not have a source of income sufficient to pay her creditors. She did not have, at the time of the hearing, an immediate "ability to pay."

3. ***The Court looks at the debtor's ability to pay as of the date of the hearing on the motion to dismiss–not as of the date the debtor filed the petition.***

When a debtor's ability to pay is different at different points in the case, which point in time is relevant to the determination of abuse? Should the Court look to her ability to pay in the six months prior to January 2006–in other words, to her ability to pay during the "current monthly income" period? Or should it look to her ability to pay at the time of the hearing?

At least two courts have concluded that it is the debtor's ability to pay at the time of the hearing that is relevant. In <u>re: Pak</u>, the bankruptcy court for the Northern District of California concluded that, because emerging BAPCPA case law held that actual and anticipated future income, rather than the historical "current monthly income," should be used in determining a Chapter 13 debtor's "projected disposable income" for the purposes of confirming a Chapter 13 plan, "this is also the correct income figure to use in deciding whether to grant or deny a motion to dismiss a Chapter 7 case under section 707(b)(3)(B)." <u>In re: Pak</u>, 343 B.R. 239, 245-246 (Bankr. N.D. Cal. 2006). The <u>Pak</u> court cited <u>In re: Jass</u>, 340 B.R. 411 (Bankr. D. Utah 2006) and <u>In re: Barr</u>, 341 B.R. 181 (Bankr. M.D.N.C. 2006) in support of its conclusion.

The Delaware bankruptcy court came to the same conclusion in <u>In re: Pennington</u>, ___ B.R. ___, 2006 WL 2505942 (Bankr. D. Del., August 30, 2006). At the time that the <u>Pennington</u> debtor filed his petition, he had a car payment of $557 per month. At the time of the hearing, his car payment was only $265.29 a month, plus an increased insurance premium of $43. <u>Id.</u> at *2.

11

At the time the debtor filed his petition, then, he had less ability to pay his debts than he did at the time of the hearing. He argued that the court was limited to considering his ability to pay as of the date of the petition. Id.

The Pennington court rejected this argument. The court first observed that there was nothing in BAPCPA's language or legislative history indicating "that Congress meant to limit temporally the Court's consideration of the Debtor's financial condition when determining whether to dismiss a case for abuse." Id. at *3. In addition, the court noted that considering ability to pay as of the time of the hearing on the motion to dismiss was consistent with the reasoning in "substantial abuse" cases under the former § 707(B). It cited Green v. Staples (In re Green), 934 F.2d 568, 572 (4th Cir. 1991) for the pre-BAPCPA proposition that "[e]xploring . . . the relation of the debtor's future income to his future necessary expenses, allows the court to determine more accurately whether the particular debtor's case exemplifies the real concern behind Section 707(b): abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors." Id. at *4.

Finally, the Pennington court pointed out that considering the debtor's ability to pay as of the time of the hearing comported with the line of cases under BAPCPA holding that courts must consider debtors' future income and expenses when determining whether to confirm a Chapter 13 plan. Id. at *4. This is the same line of cases to which the Pak court referred, which has become longer with the passage of time. In addition to In re: Jass, 340 B.R. 411, 418 (Bankr. D. Utah 2006), which the Pak court cited, the Pennington court cited In re: Demonica, 345 B.R. 895, 900 (Bankr. N.D. Ill. 2006); In re: McGuire, 342 B.R. 608, 614 (Bankr. W.D. Mo. 2006); and In re: Hardacre, 338 B.R. 718, 722 (Bankr. N.D. Tex. 2006).

This Court finds the reasoning in Pak and Pennington compelling. The Court concludes that it must look to the debtor's ability to pay her creditors at the time of the hearing. As stated above, at the time of the May 2006 hearing on the motion to dismiss, the debtor–being unemployed–did not have an immediate ability to pay her creditors.

4. ***The Court also must look at the whether the debtor's inability to pay is self-imposed.***

The fact that the debtor did not have a source of income at the time of the hearing, however, does not end the inquiry. In the face of the debtor's unemployed status, the trustee's counsel stated at the May hearing that ". . . the question is is the Debtor voluntarily unemployed?" Transcript at p. 11. The trustee's counsel argued that "[t]he Debtor is able to work. She's in the best position she's ever been in to find work, and to allow her to continue in Chapter 7 would be an abuse of the bankruptcy system." Id. at p. 26.

a. *The debtor appears to be unemployed by choice.*

The debtor's testimony indicated that she was unemployed because she wanted to find a job in the field in which she'd received her degree, but as of the date of the hearing, had been unable to do so. This inability to find a job in her field resulted from the fact that there were few facilities of the type that would provide a job in her field in the Racine/Kenosha area (where she lived). She did not want to obtain a job in her field outside of the Racine/Kenosha area, because that would require her to relocate, and she was not willing to relocate (and unsure whether she would be able to do so). She testified that she had not really looked for jobs outside her chosen field because of the amount of money and time she'd put into getting her advanced degree and her concern that obtaining jobs outside her field while waiting to obtain a job within her field

13

might make her appear to future employers to be someone who could not hold down a job long-term.

While there is little question than an unemployed debtor whose debts exceed her assets does not have the immediate ability to pay her creditors, one cannot help but wonder–as counsel for the trustee encouraged the Court to do–about the reason for debtor's unemployment. Is it because she truly cannot find any employment that would give her sufficient income to support herself and pay something to her creditors?

> b.  *A debtor's choice to be unemployed is relevant in another*
> *provision of the Bankruptcy Code.*

There is precedent in the bankruptcy universe for asking this question. Prior to BAPCPA, § 523(a)(8) of the Bankruptcy Code stated that a debtor could not obtain a discharge of student loan debt unless the failure to obtain a discharge would impose "an undue hardship on the debtor and the debtor's dependents." While BAPCPA shifted the language of § 523(a)(8) around a bit, the result is the same–student loan debt is not dischargeable under BAPCPA unless the failure to discharge the debt would impose an "undue hardship" on the debtor.

In the context of determining whether the failure to obtain a discharge of student loan debt would work an "undue hardship," the Seventh Circuit has utilized a three-pronged test. First, the debtor must show "that he cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the loans." Second, he must show "that additional circumstances exist indicating that the state of affairs is likely to persist for a significant portion of the repayment period of the student loans." Third, the debtor must show "that [he] has made good faith efforts to repay the loans." Goulet v. Educational

Credit Management Corp., 284 F.3d 773, 776 (7th Cir. 2002), *citing* In the Matter of Roberson, 999 F.2d 1132, 1135 (7th Cir. 1993), Brunner v. New York State Higher Educ. Serv. Corp., 831 F.2d 395, 396 (2d Cir. 1987).

Under the second prong of this undue hardship test, courts must consider whether there are any circumstances indicating that the debtor's inability to both minimally support himself and his dependents and pay the student loan debts will persist for a significant portion of the loan repayment period. The second prong of this test, according to the Seventh Circuit, "imputes to the meaning of 'undue hardship' a requirement that the debtor show his dire financial condition is likely to exist for a significant portion of the repayment period . . . . Accordingly, the dischargeability of student loans should be based on the *certainty of hopelessness*, not simply a present inability to fulfill financial commitment." Goulet, 284 F.2d at 778, *quoting* Roberson, 999 F.2d at 1135-36.

When analyzing whether repayment of student loan debt would work an undue hardship on a debtor, then, the Seventh Circuit asked whether the debtor's employment situation was hopeless, and whether the debtor had made any good-faith efforts to repay the loans. The trustee's argument in this case—that the debtor has the ability to work, and that she hasn't really tried to exercise that ability—implies a similar analysis. In fact, the Seventh Circuit's recitation of the debtor's situation in Goulet parallels the trustee's recitation of this debtor's circumstances.

In Goulet, the Seventh Circuit concluded that the debtor had not met the second prong of the three-part undue hardship test for the following reasons:

> . . . As the bankruptcy court noted, Goulet is an intelligent man. The record does not reveal that he lacks usable job skills or that he is hindered by a limited education. In fact, because of the loans, he received an excellent education. The

15

natural conclusion, when considering his exemplary educational record and nearly-completed graduate work, is that Goulet can apply himself when he desires to do so. The record does not demonstrate that he lacks the capacity to work, only that he does not seem anxious to do so. Moreover, even if Goulet's prospects in the mental health field or the insurance industry are foreclosed, there is no evidence that Goulet is unemployable in other areas. Rather, the record indicates that Goulet has simply failed to diligently pursue employment such that he would be able to alleviate his financial burdens. See [In re] Brightful, 267 F.3d [324,] 329 n.4 [3d Cir. 2001)] (record indicates that debtor had not diligently pursued employment). Under these circumstances, we conclude that Goulet's condition has not reached the "certainty of hopelessness" that would lead us to find that his condition is likely to persist for a significant portion of the repayment period.

Id. at 789.

The Seventh Circuit also found debtor Goulet's lack of effort to find employment relevant to the third prong of the undue hardship test–the "good-faith-effort-to-repay-the-outstanding-loans" prong. The court noted that it did not need to make a determination on good faith in light of its finding that the second prong had not been met. Still, it observed that "while there was some evidence that Goulet had made an effort to minimize his expenses (apparently by staying at his mother's home and letting her pay for everything), there was little evidence of significant efforts to obtain employment or any effort to apply available income to the student debt. While it is hard to see good faith in paying nothing when obtaining payment deferrals, we need not resolve this question . . . ." Id. (citations omitted).

In this case, the debtor also appears to be an intelligent, educated young woman who can apply herself when she chooses to do so. This debtor, like Mr. Goulet, does not appear to lack the ability to work. Rather, she lacks the willingness to work in any field other than her chosen field, and then only at a job in southeastern Wisconsin (if such a job exists in that geographic area). There is no evidence that this debtor is unemployable in other fields–in fact, she has held

16

teaching and sales jobs. Like the debtor in <u>Goulet</u>, this debtor gives every appearance of being able to get a job–although not a job in her field–which would pay her an income sufficient to support herself, and possibly to pay some dividend to her creditors.

        c.     *The Undue Hardship Analysis in Student Loan Cases is Instructive when Considering the Abuse Analysis under § 707(b)*

Determining whether repayment of a student loan debt constitutes an undue hardship is different from determining whether a debtor is abusing Chapter 7 by seeking immediate discharge of all debts. The standard for discharging student loans is higher than the standard for discharging other loans for very particular reasons. As the Seventh Circuit has observed, "Educational loans are different from most loans. They are made without business considerations, without security, without cosigners, and rely[] for repayment solely on the debtor's future increased income resulting from the education. In this sense, the loan is viewed as a mortgage on the debtor's future." <u>In the Matter of Roberson</u>, 999 F.2d 1132, 1135-36 (7th Cir. 1993), *quoting* H.R. Rep. No. 595, 95th Cong., 1st Sess. 133 (1977).

But while courts utilize a different standard in determining whether to discharge student loan debts than they do in determining whether a debtor may seek full discharge of other debts through a Chapter 7 proceeding, the rationale underlying both standards is similar. In both the undue hardship/good faith standard for student loan debt and the abuse standard for Chapter 7 discharge, courts are required to make a very basic determination about whether the debtor is treating her creditors fairly. Section 523(a)(8) does not say that a debtor cannot obtain discharge of student loan debt. Rather, it says, in essence, that the debtor first has to demonstrate that she's tried every reasonable avenue to repay the debt before she can obtain the discharge. Section

17

707(b) does not say that debtors cannot obtain Chapter 7 discharge of their debts. Rather, it says that debtors cannot obtain such a discharge if they act in bad faith, or if the totality of their financial circumstances indicates that they can pay something to their creditors.

The Court finds that a debtor's failure to seek any but very limited–possibly non-existent–employment, and thus her failure to make a real attempt to pay something to her creditors before seeking discharge of her debts, is not behavior that treats her creditors fairly. It is not behavior that indicates that the debtor has tried her best to repay her debts before throwing in the towel and seeking Chapter 7 discharge as a last resort.

Similarly, the Court finds that it can, and should, consider whether the debtor is exercising good faith in seeking an immediate Chapter 7 discharge. Counsel for the trustee stated at the hearing that she did not seek the dismissal based on the "bad faith" prong of § 707(b)(3). The Court does not see this as an impediment to its consideration of the debtor's lack of employment, for two reasons.

First, as noted above, the phrase "totality of the circumstances" implies that a court may consider all of the debtor's financial circumstances. Whether the debtor is acting in financial good faith–whether she is deliberately choosing to be unemployed when she has the ability to obtain employment–is one of the debtor's financial circumstances. Thus, the Court may consider the debtor's choice to be unemployed along with all of the debtor's other financial circumstances.

Second, as the Goulet court indicated, it smacks a bit of bad faith for a debtor to seek full discharge of all of her debts without making some effort to find employment that would enable her to repay a portion of those debts. Even if the trustee does not seek dismissal under the bad

Case 06-20188-pp    Doc 22    Filed 10/03/06    Page 18 of 20

faith prong of § 707(b)(3), nothing prohibits the Court from considering whether the debtor is acting in good faith. This debtor's circumstances do not pass the "smell test."

C.  *Relaxed Dismissal Standard*

Finally, the Court comes full circle to the fact that Congress, in enacting BAPCPA, changed the standard for dismissal under § 707(b) from "substantial abuse" to "abuse." By removing from the standard the requirement that the abuse be "substantial," Congress demonstrated an intent to make it easier for courts to weed out debtors who had viable options other than Chapter 7 discharge. The means test is evidence of this intent. Section 707(b)(3), which allows for dismissal either for bad faith or under the totality of the circumstances, is evidence of this intent. Indeed, at the signing ceremony for BAPCPA, President George W. Bush stated:

> In recent years, too many people have abused the bankruptcy laws. They've walked away from debts even when they had the ability to repay them. This has made credit less affordable and less accessible, especially for low-income workers who already face financial obstacles.

> The bill I sign today helps address this problem. Under the new law, Americans who have the ability to pay will be required to pay back at least a portion of their debts. . . . This practical reform will help ensure that debtors make a good-faith effort to repay as much as they can afford.

Press Release, White House Press Office, President Signs Bankruptcy Abuse Prevention, Consumer Protection Act (Apr. 20, 2005), available online at http://www.whitehouse.gov/news/releases/2005/04/20050420-5.html.

In light of the appearance that Congress intended that BAPCPA require debtors to make a good-faith effort to repay their debts, this Court concludes that a debtor who lacks the ability to pay because she has not engaged in a broad employment search, does not wish to work outside

19

her chosen field, does not wish to work within her chosen field outside of southeastern Wisconsin, and takes this position at the expense of her creditors, abuses the provisions of Chapter 7 by seeking an immediate discharge.

IV.    **Conclusion**

The Court finds that allowing this debtor to obtain a discharge under Chapter 7 would constitute an abuse of the provisions of Chapter 7. Accordingly, the Court grants the trustee's motion to dismiss, with one caveat. Several months have passed since the hearing on this matter. It may be that, in that time, the debtor has obtained employment. If so, the debtor may wish to convert this Chapter 7 proceeding to a Chapter 13 proceeding to avoid dismissal. Given the passage of time and the possibility that the debtor now may be employed, the Court will stay the effective date of this decision.

WHEREFORE, the trustee's motion to dismiss is GRANTED. The Court's decision is stayed until *4:30 p.m. on Friday, October 20, 2006*, to give the debtor an opportunity to consider conversion to Chapter 13.

SO ORDERED this 3rd day of October, 2006.

_____
HON. PAMELA PEPPER
United States Bankruptcy Court

Cc:    Charmaine A. Richie, Debtor
       Jeffery A. Reitz, Counsel for the debtor
       Michael F. Dubis, Chapter 7 Panel Trustee
       Amy J. Ginsberg, Office of the U.S. Trustee

20